May 3, 2021

Grievance Committee for the Tenth Judicial District
150 Motor Parkway, Suite 102
Hauppauge, NY 11788
(631) 231-3775
ad2-grv10@nycourts.gov

**Re: Grievance Complaint Regarding Attorney Christopher Dooley, State Bar No. 5239827.**

To the Grievance Committee,

We write to complain about the professional misconduct of attorney Christopher Dooley[1] while prosecuting Miguel Ramirez for the Queens District Attorney's Office.[2]

In *People v. Ramirez*, the Appellate Division found that Dooley improperly elicited bolstering testimony from a detective about the identification of the defendant.[3] Dooley further "compounded" the issue by making "improper comments" in summation regarding the "complainant's identification of the defendant."[4] The Appellate Division found Dooley's misconduct so prejudicial that it vacated Mr. Ramirez's conviction and ordered a new trial.[5]

Just as prosecutors hold individuals accountable for crimes, so should prosecutors be held accountable for their misconduct. Despite the findings of misconduct noted in this grievance, as of the writing of this grievance, the New York Attorney Detail Report lists "Disciplinary History: No record of public discipline" for Dooley.[6]

Dooley's misconduct in Queens was far from unique; serious misconduct at the Queens District Attorney's Office (QDAO) has been regularly reported for years. For example, beginning in 2007, Queens prosecutors utilized interviewing practices that undermined suspects' *Miranda* rights, according to the Appellate Division and the Court of Appeals.[7] Another QDAO

---

[1] Christopher Paul Dooley, State Bar No. 5239827, Certilman Balin Adler & Hyman, LLP, 90 Merrick Ave FL 9, East Meadow, New York 11554. Phone: (516) 296-7000. Email: cdooley@certilmanbalin.com. We do not have personal knowledge of any of the facts or circumstances of Dooley or the cases mentioned; this grievance is based entirely on the court opinions, briefs and other documents cited herein.

[2] Exhibit A, *People v. Ramirez,* 164 A.D.3d 1377 (2d Dep't 2018).

[3] *Id.* at 1377-78.

[4] *Id.* at 1378.

[5] *Id.* at 1377.

[6] *See Attorney Detail Report*, Attorney Online Services -- Search, New York Unified Court System, https://iapps.courts.state.ny.us/attorneyservices

[7] *People v. Dunbar*, 104 A.D.3d 198 (2d Dep't 2013), *aff'd*, 24 N.Y.3d 304 (2014). *See also People v. Perez*, 37 Misc. 3d 272 (Queens Sup. Ct. 2012) (deeming QDAO's *Miranda* interview practice an ethical violation of Rule 8.4(c)); Russ Buettner, *Script Read to Suspects Is Leading to New Trials*, New York Times (January 30, 2013) https://www.nytimes.com/2013/01/31/nyregion/appellate-panel-overturns-3-queens-convictions-based-on-rights-preamble.html.

policy established a wall between different units in the office, leading to trial prosecutors failing to disclose exculpatory material in the hands of another unit.[8] The Appellate Division has repeatedly criticized Queens prosecutors' improper summation conduct and advised that the Office better train its trial prosecutors.[9] There are numerous court decisions finding that QDAO prosecutors acted improperly—a recent civil lawsuit contains a list of 117 published decisions involving prosecutorial misconduct in Queens cases.[10] Dooley's misconduct appears to fall within this appalling, unprecedented, and largely-unaddressed pattern of improper conduct.

Dooley's improper elicitation of bolstering testimony and improper summation remarks in *People v. Ramirez* constitute professional misconduct in violation of Rule 8.4 of the New York Rules of Professional Conduct. For this misconduct, the Grievance Committee should suspend Dooley.

**1. The Grievance Committee has a Unique Duty to Protect the Public by Holding Prosecutors Accountable for Misconduct.**

**A. Prosecutorial Misconduct is Pervasive and Unchecked.**

Our legal system holds prosecutors to the highest standards of all attorneys.[11] When any attorney missteps, it can cause harm, typically to an individual client. But a prosecutor's misconduct can destroy a person's life—and that of their family. Moreover, a prosecutor's misconduct negatively affects both law and society. A single prosecutor's misconduct can damage "the reputation and public confidence placed" in all prosecutors and the justice system itself.[12]

---

[8] Sarah Maslin Nir, *Murder Conviction Tossed Out in Queens*, New York Times (March 18, 2013) https://www.nytimes.com/2013/03/19/nyregion/murder-conviction-reversed-over-withheld-information.html. *See also People v. Petros Bedi*, Ind. No. 4107/96, NYLJ 1202592836531 (Queens Sup. Ct. March 13, 2013) (Witness Security Program documents, which were not made part of prosecutor's file "as matter of custom," were *Rosario* and *Brady* materials; failure to disclose required vacating murder conviction).

[9] *See, e.g.*, *People v. Velez*, 2014-09698, Oral Argument, Appellate Division, 48:30-50:15 (March 16, 2018) http://wowza.nycourts.gov/vod/vod.php?source=ad2&video=VGA.1521208616.External_(PubliP).mp4 or http://wowza.nycourts.gov/vod/wowzaplayer.php?source=ad2&video=VGA.1521208616.External_(Public).mp4; *People v. Cherry,* 2014-10909*,* Oral Argument, Appellate Division, 26:34-29:31 (March 13, 2018) http://wowza.nycourts.gov/vod/vod.php?source=ad2&video=VGA.1520949280.External_(Public).mp4 or http://wowza.nycourts.gov/vod/wowzaplayer.php?source=ad2&video=VGA.1520949280.External_(Public).mp4.

[10] Amended Complaint, *Julio Negron v. The City of New York et al.*, No.18-cv-6645 (DG) (RLM) (filed March 10, 2021).

[11] *Matter of Rain*, 162 A.D.3d 1458, 1462 (3d Dep't 2018) ("prosecutors carry an obligation to hold themselves to the highest standards based upon their role in our system of justice"); *see also* 2017 ABA Prosecution Function Standards, Standard 3-1.4(a) ("In light of the prosecutor's public responsibilities, broad authority and discretion, the prosecutor has a heightened duty of candor to the courts and in fulfilling other professional obligations.").

[12] *Rain*, 162 A.D.3d at 1462.

As the United States Supreme Court and the New York Court of Appeals have stated, a prosecutor "may strike hard blows, [but] he is not at liberty to strike foul ones. *It is as much* his duty to refrain from improper methods calculated to produce a wrongful conviction *as it is* to use every legitimate means to bring about a just one."[13] Hal Lieberman, former Chief Counsel for the Departmental Disciplinary Committee in New York's First Department, has noted how unchecked prosecutorial misconduct "undermines the integrity of the entire system."[14]

But misconduct by prosecutors remains widespread and unchecked in the New York criminal legal system. A 2013 analysis of ten years of state and federal decisions revealed more than two dozen instances in which judges reversed convictions explicitly because of prosecutorial misconduct.[15] Yet these appellate courts "did not routinely refer prosecutors for investigation by the state disciplinary committees," and the disciplinary committees "almost never took serious action against prosecutors."[16] In the 30 cases where judges overturned convictions based on prosecutorial misconduct, only one prosecutor was publicly disciplined by a New York disciplinary committee. None of the other implicated prosecutors were disbarred, suspended or publicly censured and, according to personnel records gathered by ProPublica, several prosecutors were promoted and given raises soon after courts cited them for abuses.[17] As the *New York Times* Editorial Board wrote in 2018, "there's no reliable system for holding prosecutors accountable for their misconduct, and they certainly can't be entrusted with policing themselves."[18]

### B. Summation Misconduct is Pernicious and Widespread.

In closing ("summation") arguments, the prosecutor's task is to explain how trial evidence applies to the legal elements of the charged offenses. Thus, prosecutors "must stay within the four corners of the evidence"[19] and are not permitted to make arguments that rely on facts that are not in evidence.[20] Prosecutors are not permitted to engage in prejudicial or misleading

---

[13] *Berger v. United States,* 295 U.S. 78, 88 (1935) (emphasis added); *People v. Jones*, 44 N.Y.2d 76, 80 (1978) (quoting *Berger*, 295 U.S. at 88). *See also People v. Calabria,* 94 N.Y.2d 519, 523 (2000) ("Evenhanded justice and respect for the fundamentals of a fair trial mandate the presentation of legal evidence unimpaired by intemperate conduct aimed at sidetracking the jury from its ultimate responsibility--determining facts relevant to guilt or innocence.") (citation omitted); *People v. Levan*, 295 N.Y. 26, 36 (1945).

[14] Joaquin Sapien and Sergio Hernandez, *Who Polices Prosecutors Who Abuse Their Authority? Usually Nobody,* ProPublica (April 3, 2013), https://www.propublica.org/article/who-polices-prosecutors-who-abuse-their-authority-usually-nobody.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] New York Times Editorial Board, *Prosecutors Need a Watchdog*, N.Y. Times, (August 14, 2018), https://www.nytimes.com/2018/08/14/opinion/new-york-prosecutors-cuomo-district-attorneys-watchdog.html.

[19] *People v. Mehmood*, 112 A.D.3d 850, 853 (2d Dep't 2013) (internal quotation marks and citation omitted).

[20] *People v. Ashwal*, 39 N.Y.2d 105, 109-10 (1976). *See also People v. Wright*, 25 N.Y.3d 769, 779-780 (2015); *People v. Singh*, 128 A.D.3d 860, 863 (2d Dep't 2015).

argumentation that are sometimes referred to as "cardinal sins."[21] These missteps include making "irrelevant and inflammatory comments;"[22] expressing "personal belief or opinion as to the truth or falsity of any testimony or evidence,"[23] also known as vouching; appealing to the jurors' sympathies or fears;[24] shifting the burden from the prosecution to the defense;[25] and denigrating the defense, defense counsel or the defendant.[26] Engaging in these prejudicial forms of arguments is improper and can violate the constitutional right to a fair trial.[27]

As far back as 1899, the New York Court of Appeals cautioned prosecutors against appealing to "prejudice" or seeking conviction "through the aid of passion, sympathy or resentment."[28] In 1906, the Court of Appeals reversed a criminal conviction because of the prosecutor's improper comments to the jury and expressed its frustration with the frequency of such misconduct:

> We have repeatedly laid down the rule governing prosecuting officers in addressing the jury… We have repeatedly admonished [prosecutors] at times with severity… not to depart from that rule, but our admonitions have not always been regarded, although they were followed by a reversal of the judgment involved, founded solely on the improper remarks of the prosecuting officer… *Why should court and counsel violate the law in order to enforce it?* What a pernicious example is presented when such officers, intrusted [sic] with the most important duties, in attempting to punish the guilty, are themselves guilty of departing from the law.[29]

But those early rebukes from the courts seem to have had little impact on prosecutors' practices. Over the last few decades, New York courts have had to remind prosecutors over and over that "summation is not an unbridled debate in which the restraints imposed at trial are cast aside so that counsel may employ all the rhetorical devices at his command."[30] Countering the gamesmanship and instinct to win that overcomes many prosecutors at trial, courts have reminded them that "our adversarial system of justice is not a game, it has rules, and it is unfortunate when a prosecutor … plays fast and loose with them."[31]

---

[21] *See* Daniel S. Medwed, *Prosecution Complex: America's Race to Convict and Its Impact on the Innocent*, 103-118 (2012).

[22] *Mehmood*, 112 A.D.3d at 853.

[23] *People v. Bailey,* 58 N.Y.2d 272, 277 (1983) (citation omitted).

[24] *See, e.g., Ashwal,* 39 N.Y.2d at 110; *People v. Lindo,* 85 A.D.2d 643, 644 (2d Dep't 1981); *People v. Fernandez*, 82 A.D.2d 922, 923 (2d Dep't 1981); *People v. Fogarty*, 86 A.D.2d 617, 617 (2d Dep't 1982); *People v. Brown,* 26 A.D.3d 392, 393 (2d Dep't 2006).

[25] *People v. DeJesus*, 137 A.D.2d 761, 762 (2d Dep't 1988); *People v. Lothin*, 48 A.D.2d 932, 932 (2d Dep't 1975).

[26] *See, e.g., People v. Damon*, 24 N.Y.2d 256, 260 (1969); *People v. Lombardi*, 20 N.Y.2d 266, 272 (1967); *People v. Gordon*, 50 A.D.3d 821, 822 (2d Dep't 2008); *Brown,* 26 A.D.3d at 393; *People v. LaPorte,* 306 A.D.2d 93, 95 (1st Dep't 2003).

[27] *DeJesus*, 137 A.D.2d at 762.

[28] *People v. Fielding*, 158 N.Y. 542, 547 (1899).

[29] *People v. Wolf*, 183 N.Y. 464, 471-76 (1906) (emphasis added).

[30] *Ashwal*, 39 N.Y.2d at 109.

[31] *People v. Payne,* 187 A.D.2d 245, 247 (4th Dep't 1993).

Summation misconduct continues—apparently unabated—to this day. During oral argument in 2018, Justice LaSalle of the Appellate Division sharply criticized the regularity of summation misconduct:

> At what point does the unprofessionalism stop? At what point do we stop trying to win trials by being glib and win them on the evidence?… why weren't these [summation] statements so prejudicial, so unprofessional, so glib, as to inflame the passions of the jury so they wouldn't even consider themselves of the evidence, and come back with a verdict simply based on those [] unprofessional statements?[32]

As the above statement of Justice LaSalle makes clear, prosecutors make improper arguments in summation because such remarks are *effective* at winning cases—they go beyond the evidence, to manipulate biases, prejudice, and passions. Discussing prosecutorial misconduct in opening statements—where attorneys are even more limited than in summation—Justice Alan D. Scheinkman of the Appellate Division remarked in oral argument, "It's obvious that the prosecutor who tried this case was saying things for the purpose of winning it."[33]

For that reason, summation misconduct is not trivial or a "mere technicality." Summation misconduct increases the likelihood of a guilty verdict—and of the prosecutor winning their case. However, the prosecutor's role in a criminal trial is not just to win the case: the law requires that prosecutors "seek justice…not merely to convict."[34] In this role, the law requires of prosecutors "to see that the defendant is accorded procedural justice."[35] Winning a case through summation misconduct violates this fundamental obligation. The American Bar Association's own ethical standards insist that "prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office."[36]

Improper summations have been a particular problem at the Queens District Attorney's Office in recent years, distorting numerous trials, and sometimes resulting in reversal. As Justice Miller of the Appellate Division stated in oral argument:

> I could read this summation and without knowing what office it is from would say it is from Queens. That's the reputation that your office is building with this court. Because this [summation misconduct] happens repeatedly.[37]

---

[32] *Velez*, 2014-09698, Oral Argument at 0:46:55-0:48:05.

[33] *Cherry,* 2014-10909*,* Oral Argument at 0:27:45-0:28:13.

[34] American Bar Association, Standard 3-1.2 Functions and Duties of the Prosecutor (2017) ("The primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict."), https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEdition/.

[35] 22 N.Y.C.R.R. Part 1200, Rule 3.8(b) (McKinney Commentary).

[36] Commentary, Criminal Justice Standards Comm., Am. Bar Ass'n, Standards for Criminal Justice: Prosecution and Defense Function Standards 3-5.8 (3d ed. 1993).

[37] *Velez*, 2014-09698, Oral Argument at 0:48:30-0:49:00.

Similarly, commenting on the Queens District Attorney's Office's opening and closing statement misconduct, Justice Austin of the Appellate Division stated in oral argument:

> I feel like a broken record because I address this every time. Almost every time the Queens DA is before us . . . When do we say to your office, enough is enough? . . . I've got to tell you, it distresses me to no end, the line that you consistently cross. Consistently! . . . You always agree [that these remarks are improper] when you're here [in the Appellate Division]. But you keep doing it and you keep doing it and you keep doing it … I've heard somebody from your office standing there every time I've been here saying the same exact thing [agreeing remarks were improper]. And I'm here 9 years this week. It's 9 years of the same thing.[38]

Justice Leventhal, in turn, suggested that the Queens District Attorney's Appeals Bureau train the trial prosecutors about summation misconduct.[39]

Professor and former prosecutor Bennett Gershman highlights the broad shadow that summation misconduct continues to cast over the entire criminal justice system:

> The problem is not new … [M]isconduct by prosecutors in oral argument has indeed become staple in American trials. Even worse, such misconduct shows no sign of abating or being checked by institutional or other sanctions … Virtually every federal and state appellate court at one time or another has bemoaned the 'disturbing frequency' and 'unheeded condemnations' of flagrant and unethical prosecutorial behavior.[40]

Despite the courts' clear prohibition of summation misconduct, prosecutors often ignore the law in an attempt to win their cases.

### C. The Grievance Committee, as the Only Body Entrusted with Checking Prosecutorial Misconduct, has an Important Duty to Hold Prosecutors Accountable.

The Grievance Committee is in a unique position to hold New York prosecutors accountable for misconduct. While other attorneys and law enforcement officers are liable to civil lawsuits when they neglect their duties, the absolute immunity doctrine shields prosecutors from civil accountability.[41] In 1976, the U.S. Supreme Court partly justified absolute immunity for

---

[38] *Cherry*, 2014-10909, Oral Argument at 0:26:34-0:29:31.

[39] *Velez*, 2014-09698, Oral Argument at 0:49:30-0:50:15.

[40] Bennett L. Gershman, *Prosecutorial Misconduct*. § 11:1. Introduction (2d ed.) (August 2018 update) (internal citations omitted.) Gershman is a former New York prosecutor. See also Daniel S. Medwed, *Closing the Door on Misconduct: Rethinking the Ethical Standards that Govern Summations in Criminal Trials*, 38 Hastings Const. L. Q.915 (2011).

[41] *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976); *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (noting that prosecutors have "absolute immunity" for the "conduct of a prosecution"); *Dann v. Auburn Police Dep't*, 138 A.D.3d 1468, 1469 (4th Dep't 2016) ("The law provides absolute immunity for conduct of prosecutors that was intimately associated with the judicial phase of the criminal process.") (internal quotation marks omitted); *see also Ryan v. State*, 56 N.Y.2d 561, 562 (1982) (holding that "the doctrine of prosecutorial immunity" precludes "recovery against the State" for "acts of prosecutorial misconduct").

prosecutors because it believed that prosecutorial misconduct would be regulated by the "checks" of "professional discipline" by state bar organizations.[42]

Unfortunately, the U.S. Supreme Court's assumption—that professional disciplinary actions "would provide an antidote to prosecutorial misconduct"[43]—has not been borne out. A 2013 report from the Center for Prosecutor Integrity identified 3,625 cases of prosecutorial misconduct between 1963 and 2013. Of those, only 63 prosecutors—less than 2 percent—were ever publicly sanctioned.[44]

In their 2016 article, "Prosecutorial Accountability 2.0," ethics experts Professors Ellen Yaroshefsky and Bruce Green pointed out that prosecutors "were rarely disciplined for misconduct, and if so, not very seriously." Indeed, "neither judges nor defense lawyers ordinarily alerted disciplinary agencies when prosecutors acted wrongly … [D]isciplinary agencies and the courts overseeing them largely gave prosecutors a pass, perhaps hoping that prosecutors' offices would clean up their own messes."[45] "It's an insidious system," said Marvin Schechter, then chairman of the criminal justice section of the New York State Bar Association, to ProPublica. "Prosecutors engage in misconduct because they know they can get away with it."[46]

In 2018, the Appellate Division suspended New York prosecutor Mary Rain's law license for two years for a variety of misconduct, including summation misconduct.[47] In December 2020, the Appellate Division imposed the same penalty for the egregious misconduct of ex-prosecutor

---

[42] *Imbler,* 424 U.S. at 429; *see also Matter of Malone*, 105 A.D.2d 455, 459 (3d Dep't 1984) (rejecting public official's claim to prosecutorial immunity in a professional ethics proceeding).

[43] Karen McDonald Henning, *The Failed Legacy of Absolute Immunity Under Imbler: Providing A Compromise Approach to Claims of Prosecutorial Misconduct*, 48 Gonz. L. Rev. 219, 242–43 (2012).

[44] Center for Prosecutor Integrity, *White Paper: An Epidemic of Prosecutor Misconduct* (December 2013) www.prosecutorintegrity.org/wp-content/uploads/EpidemicofProsecutorMisconduct.pdf; *see also Proj. On Gov't Oversight*, Hundreds of Justice Department Attorneys Violated Professional Rules, Laws, or Ethical Standards (Mar. 12, 2014), http://pogoarchives.org/m/ga/opr-report-20140312.pdf; Charles E. MacLean & Stephen Wilks, *Keeping Arrows in the Quiver: Mapping the Contours of Prosecutorial Discretion*, 52 Washburn L.J. 59, 81 (2012) (citing "the small number of sanctions against prosecutors, relative to lawyers as a whole"); Fred C. Zacharias, *The Professional Discipline of Prosecutors*, 79 N.C. L. Rev. 721, 725 (2001) (describing the "rarity of discipline" of prosecutors).

[45] Bruce Green & Ellen Yaroshefsky, *Prosecutorial Accountability 2.0*, 92 Notre Dame L. Rev. 51, 65 (2017) (internal citations omitted); *see also* Richard A. Rosen, *Disciplinary Sanctions Against Prosecutors for Brady Violations: A Paper Tiger*, 65 N.C. L. Rev. 693, 697 (1987).

[46] *ProPublica Investigates Prosecutorial Misconduct in New York,* Innocence Project (April 3, 2013) https://www.propublica.org/article/who-polices-prosecutors-who-abuse-their-authority-usually-nobody.

[47] *Rain*, 162 A.D.3d at 1462.

Glenn Kurtzrock.[48] But even a short suspension like that received by Rain and Kurtzrock[49]—indeed, public discipline of any kind—remains rare.

Prosecutors, the public officials tasked with holding the public accountable, are not held accountable themselves. Absent strong, public discipline by the Grievance Committee, misconduct like that of Dooley will continue unabated and undeterred.

### 2. The Appellate Division Found That Dooley Improperly Elicited Bolstering Testimony in *People v. Ramirez.*

Understanding the full impropriety of Dooley's conduct necessitates surveying some basic evidentiary rules—"Evidence 101," or the bread-and-butter of a prosecutor.

The term "bolstering" means the presentation of evidence at trial of a prior consistent statement—that is, a testifying witness's prior statement that is in sum and substance the same as that witness's testimony at trial.[50] Bolstering evidence is generally excluded as hearsay, and thus inadmissible at trial.[51] However, the Criminal Procedure Law in New York created a narrow exception: a witness can testify at trial to a prior, out-of-court identification only when the witness is testifying about *that witness's own* prior identification.[52] There is no hearsay exception, and thus it is completely impermissible, for a witness to testify that *another person* identified the defendant on a previous occasion.[53]

Despite this clear and foundational prohibition, in *People v. Ramirez*, Dooley elicited testimony from a detective about the complaining witness's prior identification of the defendant.[54] As a first step, Dooley asked the detective to describe the questions he had asked the complainant during the lineup.[55] The detective listed those three questions: "Do you recognize anyone? Who do you recognize? Where do you recognize him from?"[56] Dooley continued:

---

[48] *In the Matter of Glenn Kurtzrock*, 192 A.D.3d 197 (2d Dep't, Dec. 30, 2020).

[49] In the context of the apparently rampant and egregious misconduct by Rain and Kurtzrock, the court's sanction was surprisingly light. *See, e.g.*, Bennett L. Gershman, *The Most Dangerous Prosecutor In New York State*, HuffPost (September 20, 2017), https://www.huffpost.com/entry/the-most-dangerous-prosec_b_12085240; Bennett L. Gershman, *A Most Dangerous Prosecutor: A Sequel*, HuffPost (October 1, 2016), https://www.huffpost.com/entry/a-most-dangerous-prosecutor-a-sequel_b_57effb8fe4b095bd896a0fba; Nina Morrison, "What Happens When Prosecutors Break the Law?" *New York Times*, June 18, 2018 https://www.nytimes.com/2018/06/18/opinion/kurtzrock-suffolk-county-prosecutor.html (see also Morrison's twitter thread following the *Kurtzrock* decision, https://twitter.com/Nina_R_Morr/status/1344413003903602688)

[50] *People v. Smith*, 22 N.Y.3d 462, 465 (2013).

[51] *Id.*

[52] C.P.L. § 60.30; *Smith*, 22 N.Y.3d at 466.

[53] *Id.* ("Testimony by one witness (e.g., a police officer) to a previous identification of the defendant by another witness (e.g., a victim) is inadmissible.")

[54] Ex. A, *Ramirez*, 164 A.D.3d at 1377-78.

[55] Trial Transcript at 342:4-7, *People v. Ramirez*, Ind. No. 2976/14 (Queens Sup. Ct. February 8, 2016).

[56] *Id.* at 342:8-10.

> Dooley: What was the next thing that you did after the line-up?
> Detective: After the line-up, I began the arrest processing with the case.
> Dooley: And who did you arrest?
> Detective: Miguel Ramirez [the defendant].[57]

By tying the line-up identification to the arrest, Dooley impermissibly elicited the complainant's prior identification of Mr. Ramirez through the police detective's testimony.

The Appellate Division held that Dooley's questioning of the detective "impermissibly bolstered the complainant's prior testimony by providing official confirmation of [the complainant's] prior in-court identification of the defendant."[58] For years, appellate courts have repeatedly found identical conduct to Dooley's to be improper and prejudicial.[59] Reaffirming this fundamental, basic rule, the Appellate Division reversed the conviction in this case because of Dooley's misconduct.

3. **The Appellate Division Found Dooley Made Multiple Improper Statements During His Summation in *People v. Ramirez.***

The Appellate Division also found Dooley's error in bolstering the complainant's identification testimony was "compounded by improper comments" made by Dooley during his summation regarding the complainant's identification of the robber.[60] The Court did not specify what comments amounted to this misconduct, but a review of the transcript and the appellate brief suggests what those remarks were.

To understand the improperness of Dooley's summation remarks, it is important to delve briefly into the facts relating to identification in the case. After the robbery, the complainant told the police that the perpetrator who took his chain had been wearing a black tank top.[61] At trial, the complainant initially denied making this statement, but later attributed his description to confusion regarding the difference between a t-shirt and a tank top.[62] Although the complainant had been in the United States for 13 years at the time of the trial and held a bachelor's degree, his first language was Spanish.[63] In his testimony at trial, the complainant changed his identification

---

[57] *Id.* at 342:12-15

[58] *People v. Clark*, 28 A.D.3d 785, 786 (2d Dep't 2006).

[59] *See, e.g., People v. Holt,* 67 N.Y.2d 819, 821 (1986) (error to allow testimony that police officer "had arrested the defendant after conferring with the eyewitness"); *Clark*, 28 A.D.3d at 786; *People v. Samuels*, 22 A.D.3d 507, 509 (2d Dep't 2005) ("detective's testimony that he arrested the defendant after the defendant…w[as] placed in [a] lineup[]" was "improper implicit bolstering."); *People v. Jones*, 305 A.D.2d 698, 699 (2d Dep't 2003) (prosecutor's questioning held reversible error where police witness testified that he interviewed co-defendant and then "responded to a location" where defendant was then arrested); *People v. Martinez*, 269 A.D.2d 608, 608 (2d Dep't 2000) (reversing where detective testified that he interviewed two men, became "'armed with some information,'" and arrested defendant).

[60] Ex. A, *Ramirez*, 164 A.D.3d at 1378.

[61] Trial Tr. at 295:1:24, 353:1-15.

[62] *Id.* at 293:6-21, 295:1-24.

[63] *Id.* at 250:1-251:1.

and testified that the man who robbed him had been wearing a black t-shirt, which came down two inches below the shoulders.[64]

Even as the complainant's testimony created inconsistency relating to his identification of suspect, a police officer's testimony in the case injected further inconsistencies into the issue of identification. Officer Donohue's testimony revealed that the complainant's description of the man who had robbed him was entirely different from the complainant's testimony at trial: the complainant had told the officer that the person who robbed him had been wearing a gray sweatshirt and a gray jogging jacket.[65] These inconsistent testimonies and evidence, as well as the Appellate Division's opinion, makes clear that the identification—by the sole witness, the complainant—was of central importance in the case.[66]

Yet Dooley, in his summation, denigrated the defense's valid arguments of how the inconsistent evidence relating to the tank top/t-shirt the suspect had worn created reasonable doubt whether Mr. Ramirez was guilty. Dooley reminded the jurors that the complainant was not a native English speaker and created a straw man defense argument, emphasizing this did not make the complainant "less smart," "less intelligent," or "less aware."[67] Dooley added that "to believe so" was "unfair" and "wrong to do."[68] These remarks suggested to the jurors that the defense's arguments were mean-spirited, condescending and discriminatory—rather than simply highlighting an issue of fact central to the guilt or innocence in the case. Such disparaging comments about a valid and logical argument exceeded the bounds of proper summation.[69]

Dooley did not end there. He continued by denigrating the defense, now targeting defense counsel's argument that the robbery had occurred at night and thus rendered the complainant's identification more prone to error:[70]

> So at this point, I'm going to bring up some things [defense counsel] spoke about. He told you that when you go back in the deliberation room ask yourself is it easier to see someone in the day or at night. That's not the issue because by that logic, members of the jury, you would never be able to convict anyone that was robbed or the victim of any crime at night. I submit that does not make sense.[71]

Dooley's remarks effectively twisted defense counsel's argument, suggesting that if the jurors accepted that darkness could impair complainant's vision (and thus his ability to identify the robber) then no one could be convicted of a crime that occurred at night. This fantastical slippery

---

[64] *Id.* at 292:15-19, 301:3-9, 316:11-317:2.

[65] *Id.* at 391:13-392:2.

[66] Ex. A, *Ramirez*, 164 A.D.3d at 1378. *See also* Brief for Defendant-Appellant, *People v. Ramirez*, Ind. No. 2976-14 (2d Dep't November 14, 2017).

[67] Trial Tr. at 445:2-12.

[68] *Id.* at 445:2-12.

[69] *People v. Bonaparte*, 98 A.D.2d 778 (2d Dep't 1983) (finding improper the prosecutor's insinuation that "the defense was pursuing an illegitimate strategy by exploiting the complainant's speech impediment, a conclusion for which there is no basis in the record.").

[70] *See* Br. for Defendant-Appellant at 22-23.

[71] Trial Tr. at 447:20–448:2.

slope argument was a blazing mischaracterization that denigrated defense counsel's common-sense observation—it is harder to see at night.[72]

These denigrating comments surrounding "complainant's identification of the defendant as the robber" appear to be the comments that the Appellate Division identified as improper, supporting reversal of the conviction in this case.[73]

### 4. The Grievance Committee Must Discipline Dooley for the Serious Professional Misconduct That Occurred Here.

As noted by one Grievance Committee, "[t]he legal profession expects all lawyers to conduct themselves in an honest and ethical manner in accordance with the Rules of Professional Conduct."[74] Professional misconduct occurs with a "violation of any of the Rules of Professional Conduct."[75] Grievance Committees are "committed to … recommending discipline for lawyers who do not meet the high ethical standards of the profession."[76]

Our laws and profession hold prosecutors to an even higher standard. Prosecutors wield immense power—the power to punish on behalf of the state. Such immense power, when left unchecked, can cause indelible harm. The United States Supreme Court has stated unequivocally that prosecutors "have a special duty to seek justice, not merely to convict."[77]

In handing ex-prosecutor Glenn Kurtzrock a two-year suspension for his past prosecutorial misconduct, the Appellate Division reminded us, "Prosecutors, in their role as advocates and public officers, are charged with seeing that justice is done—to act impartially, to have fair dealing with the accused, to be candid with the courts, and to safeguard the rights of all."[78]

Therefore, a prosecutor is not merely an advocate for a victim, a complainant, or society as a whole. Instead, a prosecutor is a "minister of justice," responsible to guarantee "procedural justice and that guilt is decided upon the basis of sufficient evidence."[79] Similarly, the professional guidelines promulgated by the American Bar Association make clear that a prosecutor's job goes well beyond achieving the maximum number of convictions.[80] The New York professional rules reflect this higher standard: prosecutors are the only category of

---

[72] *See, e.g., Bonaparte*, 98 A.D.2d at 778 ("[prosecutor's] statement that the 'criminal justice system might as well fold' if the jury found that the fear the complainant experienced during the incident prevented him from accurately identifying defendant, contained the implication that an acquittal would amount to a 'mockery and travesty of justice'" and was improper) (citations omitted).

[73] Ex. A, *Ramirez*, 164 A.D.3d at 1378. *See also* Br. for Defendant-Appellant at 67-70.

[74] *How to File a Complaint*, Attorney Grievance Committee — First Department (July 30, 2020), https://www.nycourts.gov/courts/ad1/Committees&Programs/DDC/How%20to%20File%20a%20Complaint%2007.30.2020.pdf.

[75] 22 N.Y.C.R.R. Part 1240.

[76] *How to File a Complaint*, Attorney Grievance Committee — First Department.

[77] *Connick v. Thompson*, 563 U.S. 51, 65-66 (2011) (quotation marks omitted).

[78] *Kurtzrock*, 192 A.D.3d 197.

[79] 22 N.Y.C.R.R. Part 1200, Rule 3.8(b) (McKinney Commentary).

attorneys with their own ethical rule.[81] Indeed, as agents of the state and ministers of justice, prosecutors play a highly public role. Failing to acknowledge their misconduct, or hold them accountable for it, tarnishes the legitimacy of the criminal system, the bar as a whole, and the rule of law itself.

### A. Dooley's Misconduct in Summation Violates New York Rule of Professional Conduct 8.4.

The standard of proof in attorney disciplinary proceedings is a fair preponderance of the evidence—not a higher standard, such as clear and convincing or beyond a reasonable doubt.[82] The Court of Appeals explained, "[T]he privilege to practice law is *not a personal or liberty interest, but 'is more nearly to be classified as a property interest, as to which the higher standard of proof has not been required.'*"[83]

The Appellate Division found Dooley's improper remarks so grave that they required vacating the conviction in *People v. Ramirez*.[84] In New York, professional misconduct for an attorney includes any violation of the New York Rules of Professional Conduct. Dooley's remarks constituted professional misconduct.

Under Rules 8.4(d) and 8.4(h), a lawyer shall not engage in conduct that is prejudicial to the administration of justice or engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer.[85] The Court of Appeals has stated that a prosecutor's improper summation remarks amount to prosecutorial misconduct.[86] A prosecutor's summation misconduct violates Rules 8.4(d) and 8.4(h) by prejudicing the administration of justice and reflecting adversely on the prosecutor's fitness as a lawyer.[87]

More broadly, Dooley's improper cross-examination and summation statements were also prejudicial to the administration of justice—they were the sole reason for vacating the conviction in *People v. Ramirez*. As such, Dooley violated Rule 8.4(d). At the same time, Dooley's choice to make those remarks, especially given that he had been a practicing prosecutor for years before this case, reflects negatively on his fitness as a lawyer. Such a failure of judgment violated Rule 8.4(h), as demonstrated by *Rain*.

---

[80] 2017 ABA Functions and Duties of the Prosecutor, Standard 3-1.2 ("The primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict."), https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEdition/.

[81] 22 N.Y.C.R.R. Part 1200, Rule 3.8(b).

[82] *See, e.g., Matter of Capoccia*, 59 N.Y.2d 549, 453 N.E.2d 497 (1983).

[83] *Matter of Scudieri*, 174 A.D.3d 168, 173 (2019) (emphasis added) (quoting *Matter of Seiffert,* 65 N.Y.2d 278, 280 (1985)).

[84] Ex. A, *Ramirez,* 164 A.D.3d 1377.

[85] 22 N.Y.C.R.R. Part 1200, Rule 8.4.

[86] *Wright*, 25 N.Y.3d at 780.

[87] 22 N.Y.C.R.R. Part 1200, Rule 8.4(d), (h); *Rain*, 162 A.D.3d at 1459.

### B. For His Misconduct, Dooley Must be Suspended.

Though the misconduct discussed here occurred years ago, New York does not have a statute of limitation barring disciplinary action against an attorney—and rightfully so. As explained by the American Bar Association, "Statutes of limitation are wholly inappropriate in lawyer disciplinary proceedings. Conduct of a lawyer, no matter when it has occurred, is always relevant to the question of fitness to practice."[88] The ABA's Model Rule 32 for Lawyer Disciplinary Enforcement makes lawyer discipline "exempt from all statutes of limitations."[89]

In considering discipline, the Second Department has considered the role of prosecutor as a "substantial factor in aggravation."[90] Simply being a prosecutor supports aggravated discipline because the law tasks them "with seeing that justice is done—to act impartially, to have fair dealing with the accused, to be candid with the courts, and to safeguard the rights of all."[91] Similarly, extensive prosecutorial experience weights towards an aggravated sanction.[92]

Though the ethical rules may be obscure to the general public, attorneys must know and follow them. In 2011, the District Attorneys Association of the State of New York mailed an ethical guide to *every prosecutor in the state* warning prosecutors to comply with the ethical rules and even specifically quoting Rule 8.4 - the rule that Dooley violated.[93]

Dooley had been licensed for approximately 3 years when he violated the Professional Rules in *People v. Ramirez*. While not yet a seasoned veteran, Dooley was also not a brand-new attorney whose misconduct can be chalked up to ignorance.

Professional discipline, through the Grievance Committee, is the mechanism entrusted by the Supreme Court of the United States to regulate prosecutorial behavior. Without appropriate sanctions, this Committee will derelict its duty and send a message—to prosecutors, defense attorneys, the courts, defendants and the public at large—that prosecutorial misconduct is not taken seriously. If the Committee failed to properly discipline Dooley, it would send a message to him, his colleagues, and prosecutors throughout New York, that serious misconduct is condoned. Only a strong message from the Grievance Committee can hold Dooley accountable and minimize repeated occurrences of this misconduct by other prosecutors.

Therefore, the Grievance Committee must suspend Dooley.

---

[88] 2020 Model Rules for Lawyer Disciplinary Enforcement, Rule 32 and Commentary, https://www.americanbar.org/groups/professional_responsibility/resources/lawyer_ethics_regulation/model_rules_for_lawyer_disciplinary_enforcement/rule_32/.

[89] *Id.*

[90] *Kurtzrock*, 192 A.D.3d 197. *See also Rain*, 162 A.D.3d at 1462 ("[P]rosecutors carry an obligation to hold themselves to the highest standards based upon their role in our system of justice.").

[91] *Kurtzrock*, 192 A.D.3d 197.

[92] *Id. See also Rain*, 162 A.D.3d at 1461 (prosecutor's experience an aggravating factor).

[93] *"The Right Thing" - Ethical Guidelines for Prosecutors*, District Attorneys Association of the State of New York (August 2012) http://www.daasny.com/wp-content/uploads/2014/08/Ethics-Handbook-9.28.2012-FINAL1.pdf. Note that this is the 2012 version. The introductory letter states that in 2011, the Ethics Handbook was mailed to "every District Attorney and Assistant District Attorney in the state." It is unclear if this version is the exact same as the 2011 version that was mailed.

## Conclusion

Prosecutorial misconduct in summation and cross-examination, as committed by Dooley, has a devastating impact on due process and the right to a fair trial. It is a long-standing, largely unaddressed problem in the court system. To our knowledge, though the Appellate Division found Dooley to have acted improperly, he remains unsanctioned for this misconduct.

As "officers of the court, all attorneys are obligated to maintain the highest ethical standards."[94] To that end, "the grievance process exists to protect the public... By bringing a complaint to a committee's attention, the public helps the legal profession achieve its goal."[95] The judicial finding identified in this grievance provides far more evidence than necessary to meet the "fair preponderance of the evidence" standard to discipline the prosecutor at issue, but we call upon the Grievance Committee to go further and investigate far beyond the court finding identified in this grievance. For the legitimacy of and public trust in the criminal system, and the bar, the investigation should be public at every stage possible.

Below are some essential aspects of such an investigation:

1. The Committee should begin by investigating the many other cases prosecuted by Dooley. As the comment to Rule 8.3 of the New York Rules of Professional Conduct reminds us, "An apparently isolated violation may indicate a pattern of misconduct that only a disciplinary investigation can uncover."[96] Using its power to investigate, including to issue subpoenas and interview witnesses, the Committee can and should obtain a list of all cases that this prosecutor worked on and contact the attorneys, witnesses, and accused persons (while protecting the accused's rights to privacy and counsel) in those cases. The Committee should also identify all of Dooley's other cases where the issue of misconduct was raised in the courts before trial, at trial, or on appeal, or was the subject of other ethical grievances, mentioned in the media, or identified in any other source.

2. The Committee should promptly investigate whether any supervising attorney at the Queens District Attorney's Office (QDAO) is also culpable for the ethics violation cited in this grievance under Rule 5.1(d) of the New York Rules of Professional Conduct, which provides direct culpability for supervising attorneys under various circumstances, including when a supervisor knowingly ratifies improper conduct or knows of the conduct when it could be prevented but fails to take remedial action.[97]

---

[94] NYSBA Committee on Professional Discipline, Guide to Attorney Discipline, available at: https://nysba.org/public-resources/guide-to-attorney-discipline/.

[95] *Id.*

[96] Rule 8.3, Comment [1].

[97] Rule 5.1 (d). A lawyer shall be responsible for a violation of these Rules by another lawyer if:

(1) the lawyer orders or directs the specific conduct or, with knowledge of the specific conduct, ratifies it; or

(2) the lawyer is a partner in a law firm or is a lawyer who individually or together with other lawyers possesses comparable managerial responsibility in a law firm in which the other lawyer practices or is a lawyer who has supervisory authority over the other lawyer; and

3. The Grievance Committee should investigate whether the Queens District Attorney's Office (QDAO) and its managing attorneys complied with its duties under Rule 5.1 of the New York Rules of Professional Conduct, requiring that law firms as a whole, and managing attorneys in particular, make efforts to ensure that all lawyers in the firm conform to the New York Rules of Professional Conduct.

4. The Committee should identify any prosecutors trained and/or supervised by Dooley and determine whether instances of prosecutorial misconduct can also be found in their work as prosecutors.

We recognize that bar discipline provides a uniquely individual remedy that will not, on its own, remedy the systemic problems identified above in this letter. For this reason, we also call for the implementation of an independent public commission empowered to investigate all cases handled by this prosecutor and vacate convictions where appropriate. To be clear, we do not mean a closed-door, cloaked process at the Queens District Attorney's Office, but rather a commission that operates transparently and includes members of the public, including members of impacted communities of color, public defenders and other criminal defense attorneys, civil rights attorneys, and people who have been incarcerated and their loved ones.

Thank you for your careful consideration of this matter.

_____
Cynthia Godsoe
Professor of Law
Brooklyn Law School

_____
Nicole Smith Futrell
Associate Professor of Law
CUNY School of Law

_____
Steven Zeidman
Professor of Law
CUNY School of Law

_____
Daniel S. Medwed
University Distinguished Professor of Law and Criminal Justice
Northeastern University

_____
Abbe Smith
Scott K. Ginsburg Professor of Law
Director, Criminal Defense & Prisoner Advocacy Clinic
Co-Director, E. Barrett Prettyman Fellowship Program
Georgetown University Law Center

---

(i) knows of such conduct at a time when it could be prevented or its consequences avoided or mitigated but fails to take reasonable remedial action; or

(ii) in the exercise of reasonable management or supervisory authority should have known of the conduct so that reasonable remedial action could have been taken at a time when the consequences of the conduct could have been avoided or mitigated.